(C. D. 1749)

F. T. Griswold Mfg. Co. *v.* United States

United States Customs Court, First Division

(Decided January 12, 1956)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Dorothy C. Bennett*, trial attorney), for the defendant.

Before Oliver, Mollison, and Wilson, Judges

Wilson, Judge: The merchandise under protest consists of a metal article invoiced as an "inscriber" (plaintiff's exhibit 1), which was imported with a certain optical testing instrument known as a "straightedge" (plaintiff's exhibit 2), together with all the necessary equipment therefor. The "straightedge" instrument is used for testing the flatness of surfaces, in which connection the inscriber, when employed with it, is mounted upon and attached to the instru-

ment and serves to give a permanent recording on graph paper of the measurements being made by the straightedge to which it is attached.

The importation covered by the involved entry, including the inscriber in question, was classified as an entirety under paragraph 228 (a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, supplemented by Presidential proclamation, T. D. 52820, at the rate of 50 per centum ad valorem as "optical measuring or optical testing instruments, * * * frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished."

Plaintiff's principal claim is that the imported inscriber is not a frame or mounting for the optical measuring instrument, the straightedge, with which it was imported, nor is it a part of such optical measuring instrument, and that the inscriber should be held separately dutiable at the rate of 22½ per centum ad valorem under paragraph 397 of the tariff act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as a manufacture of metal.

The only witness called was the president of the plaintiff concern, who testified that his firm was engaged in the business of manufacturing and importing measuring tools of different types. He stated that an optical straightedge is an instrument used to measure the flatness of a given surface by comparison of the surface with a beam of light (R. 7), specifically describing its operation as follows:

A. It consists of a housing carrying lenses and a microscope that travels within that housing. In the microscope, there is an electric flap that sends out a beam of light that travels from one end to the other. The beam of light is theoretically a straight line and as the microscope travels along the surface, the differences between the surface and the straight line show up in the microscope eye-piece and measured by means of an optical micrometer.

Q. When you indicated that the microscope travels along the surface, did you mean that you actually move the microscope along the surface of the object being tested?—A. Yes, I did.

Describing the purpose and use of an inscriber such as plaintiff's exhibit 1, the witness testified as follows:

Q. Mr. Griswold, will you kindly explain how, if at all, an Inscriber, such as Exhibit 1, is used in connection with an optical straightedge, such as that illustrated in Illustrative Exhibit 2?—A. Well, the so-called Inscriber is an attachment that when mounted on an optical straightedge, serves to give a permanent recording on graph paper of the measurements that were being taken.

Q. And, how, if at all, is the graph mounted upon the optical straightedge as shown on Illustrative Exhibit 2?—A. The graph paper is thumb-tacked to one front surface of the optical straightedge housing.

Q. Such as that depicted on front of Exhibit 2, the flat surface?—A. Yes.

Q. And, how, if at all, do you attach the Inscriber to the optical straightedge so as to make the permanent record to which you referred?—A. It mounts on the microscope that travels within the optical straightedge housing.

Q. By screws?—A. By one small screw.

Q. And how, if at all, is the permanent record made with the graph paper with the use of the Inscriber?—A. The Inscriber carries a flexible arm at the end of which is a needle. The flexible arm is pushed by the thumb, causing the needle to punch the graph paper and establish coordinate points which at a later time are drawn together to form a continuous curve.

Plaintiff's witness further testified that an optical straightedge, such as that illustrated in plaintiff's exhibit 2, can be used for its designed purpose of measuring surfaces without the use of an inscriber, such as exhibit 1; that "the Inscriber is merely an attachment 'to be used to form a permanent record. The straightedge can be used without it and measurements can be taken but no permanent record is made of the——of it other than in the mind of the observer." (R. 13.) He then stated that the inscriber is detachable and that, ordinarily, it is not used in connection with a straightedge; that the straightedge will perform its function of testing surfaces without an inscriber; and that an inscriber, such as plaintiff's exhibit 1, can be used independently from a straightedge in that it "could be attached to other types and varieties of instruments and perform the same function for them." (R. 15.) He also testified that he had at times sold inscribers separately, without selling optical straightedges, but admitted that this was not the usual course of business (R. 26); and that at times his firm, when importing optical straightedges, has included in the same shipment graph paper and inscribers, as well as the thumbtacks employed in connection therewith (R. 17).

Plaintiff's witness, after identifying the inscriber illustrated on plaintiff's exhibit 2, testified that, in the illustration so marked, the inscriber is attached to the feeler microscope of the straightedge instrument and "is in operation" and that the thin line "beneath the straight line on Exhibit 2, 'B' is the line which would be drawn from the points that are made on the graph paper by the Inscriber as it goes along," the purpose of such lines being to show at any given point the extent to which the surface being tested for flatness may contain elevations or indentations that are not desired, so that the tested surface may be ground down afterwards to make it completely flat (R. 18–19).

Plaintiff's witness stated that the purpose of the inscriber is to record the findings so that the defects can be corrected (R. 20) and that the inscriber must be attached to the straightedge to accomplish its purpose. He agreed that, as indicated on the consular invoice, the straightedge and the inscriber here in question were purchased at the same time on the one order and that the invoice describes the inscriber as being for the housing girder of the straightedge instrument on the same invoice (R. 22). The witness admitted that the inscriber must be manufactured to fit the feeler microscope of the straightedge instrument and that it would appear that the inscriber in the involved shipment was manufactured for use in connection with the particular

straightedge described on the invoice, and stated that, in its condition as imported, it was unlikely that the inscriber at bar could be used without some modifications on an instrument other than the straightedge with which it was here imported.

Subsequently, plaintiff's witness testified that, instead of recording the results of the flatness test by means of the inscriber, the operator of the straightedge instrument can use the scale on the housing, which indicates the position of the "feeler" microscope at any point, and can mark with a pencil on the metal itself the points to be corrected (R. 27). The witness explained that, when using an inscriber in connection with an optical straightedge, the graph is employed in making a record of the irregularity in the flat surface being tested to show at what points the work needs correcting, i. e., it indicates how much material should be removed from high points in order to obtain a flat surface. He then stated that, after the results of the straightedge test are recorded by the inscriber, a cutting tool is employed to correct the material, after which the surface is rechecked by use of the straightedge instrument to see if it has been properly corrected (R. 28–30).

Essentially, the question here is whether the optical testing instrument, the "straightedge," with all its parts and equipment, including the "inscriber" under consideration, is dutiable as an entirety. In this connection, the Government contends that the plaintiff has failed to overcome the presumption of correctness attaching to the collector's classification of the instant importation as an entirety. It further maintains that the plaintiff has failed to sustain its burden of proving that the "inscriber" at bar is not properly dutiable under paragraph 228 (a) of the Tariff Act of 1930 as a "mounting" or "part of" an optical testing instrument.

What constitutes a "part" for tariff purposes has been frequently passed upon by this and our appellate court. In *Schweitzer* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872, the involved merchandise was known in the trade as "paper-makers' felt," "drier felt," and "woolen drier felt," and was imported in the form of "endless belts" for use on a Fourdrinier papermaking machine. These "belts" were used to help convey paper, after it was manufactured in sheet form, to a dryer. The material in question was assessed for duty as woven fabrics under paragraph 1109 of the Tariff Act of 1922. Plaintiff claimed the merchandise properly dutiable as "parts" of machines under paragraph 372 of the said act. The record disclosed that the felt in question was ordered according to the desired dimensions; that the use of such article on most Fourdrinier papermaking machines was necessary in the manufacture of "tissue grade" paper; that it was not used, however, in the manufacture of heavier grades of paper; and that it was used in sizes, other than those imported,

on "cloth-finishing machines," as well as for dyeing and cleaning, and on laundry machines. It further appeared that the "belts" could be cut to suitable lengths and used for various purposes, but that, when used in the form of "endless belts," the merchandise was used in some sort of machine. The merchandise in question was not sold by manufacturers of papermaking machines nor included in their specifications for such machines, but was purchased by paper manufacturers from woolen textile manufacturers. Testimony further disclosed that a "complete Fourdrinier machine consists of screens, head box, the wire part, and sometimes four sets of presses, drier parts, calenders, reel, slitter, and winder," and that, when such machines are designed for use in the manufacture of light-weight papers, the "drier frames" are usually equipped by the manufacturer with carrier frames and guides and stretchers for carrying the felt over the driers.

The Government in the *Schweitzer* case, *supra,* contended that the involved merchandise was not so manufactured and finished as to be exclusively dedicated to any particular use or for any particular machine and, further, that it retained its separate identity, even when attached to papermaking machines, and that, as it was used on other machines, the felt in question could not be classified as "parts of machines."

In holding the involved merchandise dutiable as "parts" of machines, the court in the *Schweitzer* case, *supra,* page 290, stated:

* * * The articles in question have been completely manufactured. They were ordered and delivered according to certain specifications for use on a Fourdrinier paper-making machine, and were used for no other purpose. They were essential to the proper use of the machine in the manufacture of "tissue grade" paper. Their use was not optional with the paper manufacturer. They were not used as accessories for comfort or convenience in the manufacture of paper, but were used as essential and integral parts, without which the machine could not perform one of its proper and important functions, the only function in which the importer was interested—the manufacture of "tissue grade" paper.

At page 292, the court in the same case set forth the following rule:

So it may be said that whether an article is an accessory or an integral part of a machine depends, to a considerable extent, upon its use. If its use is casual, auxiliary, or optional, it is an accessory. If, however, it is used as an essential part, and if the machine is incapable of performing its ordinary and proper functions without it, it will be considered, at least for tariff purposes, as an integral part of the machine.

The Fourdrinier machine is incapable of performing one of its important, ordinary, and proper functions—the manufacture of "tissue grade" paper—without the aid of the articles in question. These articles, when attached to the machine, become as much a part thereof, as the drier frames, carrier frames, guides, and other parts. They will not perform their proper functions as "paper-makers' felts" until they are attached to the machine, nor will the machine function as a complete machine without the "paper-makers' felts." Each is dependent upon the other, and neither will perform its proper function unless used together.

In *United States* v. *Bosch Magneto Co.*, 13 Ct. Cust. Appls. 569, T. D. 41434, our appellate court, in holding certain lamps and horns dutiable under paragraph 369 of the Tariff Act of 1922 as parts of automobiles, rather than under paragraph 399 of the act as manufactures of metal, not specially provided for, stated:

We think lamps and horns are essential and necessary parts of automobiles and that automobiles can not be efficiently, safely, or properly operated without them. Even if we were to adopt the test made in certain cited cases where, if the use is optional, it is not "a part," we would not regard our views in this case as in conflict with decided cases, since it is a matter of common knowledge that the use of lamps and horns is not optional if the operator of the machine operates it in a safe, efficient, and proper manner. The machine could be operated without mud guards, without tires, and without a windshield, and yet it is obvious that they are necessary and generally required if the machine is to be operated in its usual manner. To operate an automobile without lights would certainly limit it to day operations, and the use of a horn or some other sounding device is usually so essential to the safety of the operator of the car and to the public in general as to make its use almost indispensable.

In the case of *Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T. D. 34249, the appellate court, in holding that "music rolls" for use on player pianos were parts of "musical instruments," said:

The line between that which constitutes a part of a mechanical device and that which is merely supplementary or accessory to it is sometimes quite narrow and difficult to distinguish, but in this case we think it perfectly clear that although the rolls are not necessary parts of the Welte Mignon considered as an ordinary piano, they are essential constituents of the mechanism which makes it a player piano and are therefore parts of the instrument. * * *

The reasoning employed in the cases above cited has equal application in the case at bar. For reasons hereinafter recited, we are of opinion that the inscriber here under consideration is properly classifiable as a part of an optical measuring or testing instrument, as assessed.

Furthermore, we are convinced that the rule of the presumption of correctness of the collector's classification is applicable in determining the issue before us. The case of *Engis Equipment Co. and Alltransport, Inc.* v. *United States*, 30 Cust. Ct. 311, Abstract 57012, concerned a shipment described on the invoice as "1 Alignment Telescope with Mountings, Parts & Accessories," which the collector classified as an entirety under the same provision of the tariff act (paragraph 228 (a)) as that here in question for "optical measuring or optical testing instruments * * * and parts * * *." Plaintiffs in that case limited their claim to the telescopes in the involved shipment, contending that they were dutiable under paragraph 228 (b), as modified, as "telescopes, finished or unfinished, not specially provided for." The court, however, upheld the collector's classification and, in doing so, at page 312, stated:

To sustain plaintiffs' contention as it is now presented before us, and hold the instrument, *per se*, to be classifiable under paragraph 228 (b), as modified, *supra*, without any proof—and the record contains none—from which to determine the tariff status of all of the other items imported in the same shipment, would have the effect of classifying the present importation, an entirety, under two separate categories carrying two different rates of duty. Such a result would create an anomalous situation that could not be reconciled with an intent of Congress.

On rehearing, the court adhered to its original holding (*Engis Equipment Co. and Alltransport, Inc.* v. *United States*, 32 Cust. Ct. 497, 499, Abstract 58105), stating as follows:

It should be emphasized that the collector's classification of the present merchandise as an entirety carries with it the presumption that the classifying officer found all the necessary facts to exist which brought the goods within the classification adopted by him. *United States* v. *Marshall Field & Co.*, 17 C. C. P. A. (Customs) 1, T. D. 43309. * * *

So, too, in the case at bar, plaintiff has the burden of overcoming the correctness of the collector's classification that the merchandise described as one optical straightedge, consisting of one girder housing, one feeler microscope with accessories, and one inscriber, is properly dutiable as an entirety. In our opinion, plaintiff's proof fails in this respect.

In support of its claim that the involved inscriber is not dutiable as a "part of" an optical measuring or testing instrument, as classified, plaintiff directs our attention to the case of *Inter-Maritime Forwarding Co., Inc.* v. *United States*, 31 Cust. Ct. 301, Abstract 57622. The merchandise there involved consisted of ophthalmoscopes, instruments for illuminating the retina of the eye in the diagnosis of eye disease, and certain transformers employed with the ophthalmoscopes, when necessary to transform current from one voltage to another. The question for determination was whether the transformers and certain "leads" or wires used to connect the transformers to the ophthalmoscopes were parts of the latter instruments. In holding that the transformers and leads under consideration were not "parts of" ophthalmoscopes, this court cited as controlling of the issue the case of *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851. Our appellate court therein, in holding that certain wooden tripods were not parts of cameras, stated:

It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article*. *Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T. D. 34249; *United States* v. *American Steel & Copper Plate Co.*, 14 Ct. Cust. Appls. 139, T. D. 41673; *Peter J. Schweitzer, Inc.* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872, and cases cited therein; *United States* v. *John Wanamaker*, 16 Ct. Cust. Appls. 548, T. D. 43266.

\*  \*  \*  \*  \*  \*  \*

It is evident, we think, from the character of the articles and from the testimony in the case, that, when a tripod and a camera are used together, each "performs its separate function without loss of any of its essential characteristics." Whether separate or joined, each is complete in itself, each is a distinct and separate commercial entity. See *United States* v. *Borgfeldt & Co.*, 11 Ct. Cust. Appls. 105, T. D. 38750; *Dow Co.* v. *United States*, 11 Ct. Cust. Appls. 249, T. D. 39077; *Columbia Shipping Co. et al.* v. *United States, supra*; *United States* v. *Kalter Mercantile Co. et al., supra.*

We are of opinion, therefore, that, although it may be necessary to use *tripods* as *supports* for the involved *cameras*, tripods are not, for that reason, integral, constituent, or component parts of such cameras. * * * [Italics quoted.]

The *Inter-Maritime Forwarding Co.* case, *supra*, in our opinion, is not controlling in the determination of the present issue. The ophthalmoscopes involved therein required a 12-volt current. The transformers and leads were employed in conjunction with the ophthalmoscopes only when it was necessary to adjust electric current to the proper voltage and were not essential parts of the ophthalmoscopes themselves. The record there showed that, in a building equipped with the required electric current, the ophthalmoscopes performed their proper function completely and efficiently, without the use of the transformers or leads. The ophthalmoscopes and transformers were separate and distinct entities. The inscriber in the case at bar, on the other hand, was manufactured to fit the straightedge instrument covered by the involved shipment, and it was so dedicated to that use at the time of manufacture. It was further established that, to adapt the involved inscriber for recording use on any other instrument, it would be necessary to make certain adjustments on the article. Finally, the record established that no permanent record of the results of the tests made by the straightedge instrument could be had without the employment of the inscriber to record the results of such test. It would appear, therefore, that a complete and efficient performance of the straightedge testing instrument requires the use of the involved inscriber to complement the work of the testing instrument. In such manner, the inscriber is essential to the proper operation of the testing instrument with which it is employed, and, accordingly, is a "part of" such instrument.

On the basis of the record here presented, plaintiff has failed to overcome the presumption of correctness attaching to the collector's classification of the involved merchandise under paragraph 228 (a) of the Tariff Act of 1930, as modified, *supra*, under the provision therein for "optical measuring or optical testing instruments, * * * and parts." Accordingly, we find the involved merchandise properly dutiable as classified. In view of our decision herein, we deem it unnecessary to decide whether the inscriber in question is properly classifiable under the provision in paragraph 228 (a), *supra*, for "frames and mountings therefore," and parts of any of the foregoing.

The protest is overruled. Judgment will be entered accordingly.